## Oliver *verſ.* Sale.

OLIVER ſues the Defendant for ſelling him two free Mulattos for Slaves. (1) There was no Bill of Sale, but only ſeveral Receipts of Money for two *Negro Boys ſold & delivered*. It was ſuggeſted on the other Side that the Defendant ſold them not as Slaves, but only his Right, if he had any, in them. (2)— The Caſe was thus argued.
                                                        *Mr.*

───────────────

(1) The declaration was for deceit, in ſelling the mulattos to the plaintiff as ſlaves, knowing them to be free.

(2) Previouſly to the adoption of the State Conſtitution in 1780, negro ſlavery exiſted to ſome extent in Maſſachuſetts, and negroes held as ſlaves might be ſold; but all children of ſlaves were by law free. Body of Liberties of 1641, art. 91. Maſs. Colony Laws, (ed. 1660,) 5; (ed. 1672,) 10. Prov. Sts. 2 & 4 Anne. Anc. Chart. 52, 53, 745–749. 1 Hutchinſon's Hiſt. Maſs. 444. 2 Hildreth's Hiſt. U. S. 419. 1 John Adams's Works, 51, 55. James Otis's Rights of the Colonies, (1764,) 29, 37. 4 Maſs. Hiſt. Coll. 194 & ſeq. 2 Dane Ab. 413, 416, 426, 427. 3 Plym. Col. Rec. 27. 5 Ib. 216. Winſor's Hiſt. of Duxbury, 70, 71, & note. *Cutler* v. *March*, Rec. 1697, fol. 159. *Alliſon* v. *Cockran, poſt*, 94. 4 Maſs, 127, 128, & note. 13 Maſs. 551, 552. 16 Maſs. 75, 76. 10 Cuſh. 410. 2 Kent Com. (6th ed.) 252. 2 Palfrey's Hiſt. New England, 30 & note, 280 note, 370.

                                                        Slaves

1762.

SAYER
*v.*
THORP.

OLIVER
*v.*
SALE.

Rec. 1762.
Fol. 385.

A Perſon who ſells a Negro as a Slave, whom he knows to be free, is liable to an Action by the Vendee for the Fraud. *Aliter*, where he tells the Vendee at the Time of Sale that he will not ſell the Negro as a Slave.

A Depoſition which comes up in a Caſe from the Inferiour Court may be read, though the Witneſs is alſo preſent in Court.

1762.

OLIVER
v.
SALE.

*Mr. Thacher, for Plaintiff.* I think from the Words of the Receipt it may be learnt what was his Intent. *Sold & delivered* conveys the Property; and as he had really no Right to a Day's Service in the Lads, as they were free, he could not paſs any Property

---

Slaves were admitted to be church members at a period when church members had peculiar political privileges. 2 Winthrop, 26, & Savage's note. Anc. Chart. 117. 1 Bancroft's Hiſt. U. S. 360. Slaves were ſometimes required, ſometimes prohibited, to ſerve in the militia. 3 Maſs. Col. Rec. 268, 397. 4 lb. pt. 1, 86, 257. Journals Maſs. Prov. Congreſs, (ed. 1838,) 29, 302, 553. They were enliſted in the army in the Old French War. 4 Maſs. Hiſt. Coll. 199, 203. 98 Maſs. Archives, 122. They were competent witneſſes, even in capital trials, *e. g.* in the trial of the *Britiſh Soldiers* in 1770, (ed. 1770, p. 111,) and in ſuits of other ſlaves for freedom, as appears by the files of court.

The right to marry was ſecured to them in 1705 by Prov. St. 4 Anne. Anc. Chart. 748. The ſubſequent records of Boſton and other towns ſhow that their banns were publiſhed like thoſe of white perſons. In 1745, a negro ſlave obtained from the Governor and Council a divorce for his wife's adultery with a white man. *Jethro Boſton's Caſe*, 9 Maſs. Archives, 248. In 1758, it was adjudged by the Superior Court of Judicature, that a child of a female ſlave, " never married according to any of the forms preſcribed by the laws of this land," by another ſlave, who " had kept her company with her maſter's conſent," was not a baſtard. *Flora's Caſe*, Rec. 1758, fol. 296. And the wife of a ſlave was not allowed to teſtify againſt him. MS. note by John Adams of *Cæſar* v. *Taylor*, in Effex, 1772, (Rec. 1772, fol. 91,) in the poſſeſſion of Hon. Charles Francis Adams; which alſo ſhows that the defendant in an action of falſe impriſonment was not permitted under the general iſſue to prove that the plaintiff was his ſlave.

Such actions, called " ſuits for liberty," were common as early as 1765. 2 John Adams's Works, 200. The lateſt inſtance of a verdict for the maſter is believed to have been in 1768. *Newport* v. *Billing*, Rec. 1768, fol. 284. But the caſe of *James* v. *Lechmere*, in Middleſex, a year later, which has been often ſpoken of as having determined the unlawfulneſs of ſlavery in Maſſachuſetts, is ſhown by the records and files of court to have been brought up from the inferior court by ſham demurrer, and, after one or two continuances, ſettled by the parties. Rec. 1769, fol. 196. The caſe mentioned by Dr. Belknap in 4 Maſs. Hiſt. Coll. 202, as " the firſt trial of this kind," may have been that of *Margarett* v. *Muzzy*, which was a writ *de homine replegiando*, ſued out and tried in Middleſex in 1768, and on review in 1770, in which, as appears by the

Property in them, and therefore muſt be ſuppoſed to have ſold them as Slaves, or meant from the firſt to have defrauded.

*Ch. Juſt.* Everything which is bought is ſold.

Witneſſes were produced who were preſent at the Time of the Sale, and heard Defendant ſay they were Slaves.

*Mr. Otis, for Defendant.* I hold in the Caſe of a Negro, there ſhould be an expreſs Warranty of their Freedom, and that the Rule of Merchandiſe which obliges the Vendor to anſwer for what he ſells without Warranty is confined to Manufactures of the Country which a Man muſt be ſuppoſed to know the Quality of; but in this Caſe it is impoſſible in moſt Caſes to know whether they are free or not.

*Ch.*

<div style="margin-right">1762.
OLIVER
*v.*
SALE.
</div>

---

the depoſitions on file, there was much conflicting evidence, and the plaintiff prevailed. Rec. 1768, fol. 311 ; 1770, fol. 216. Slavery was certainly recognized by law in Maſſachuſetts after this ; for in May, 1771, Hutchinſon wrote to Lord Hillſborough, " Slavery by the Provincial laws gives no right to the life of the ſervant ; and a ſlave here is conſidered as a ſervant would be who had bound himſelf for a term of years exceeding the ordinary term of human life ; and I do not know that it has been determined that he may not have a property in goods, notwithſtanding he is called a ſlave." 27 Maſs. Archives, 159, 160.

Slaves convicted of theft were ſentenced, like other perſons, beſides being whipt, to pay treble the value to the owner of the goods ſtolen, and, if unable to do ſo, were ordered to be " diſpoſed of in ſervice " for life, or for a term of years, " for payment of the ſame." *Hercules & Sharper's Caſes,* Rec. 1757, fol. 54, 55 ; Docket of February term, 1757, in Suffolk, *ad finem. Jeoffs's Caſe,* Rec. 1771, fol. 35.

By virtue of the firſt article of the Declaration of Rights, prefixed to the Conſtitution of Maſſachuſetts, if not before, ſlavery was entirely aboliſhed here. 2 Bradford Hiſt. Maſs. 124. 4 Maſs. Hiſt. Coll. 201–203. 31 Ib. 90. 34 Ib. 333. Willard Memoir, 153. 4 Maſs. 128. 9 Amer. Jur. 490. 18 Pick. 208–210. 7 Cuſh. 296. 7 Gray, 478. 5 Leigh, 622, 623. 20 Law Rep. 101, 108, 456.

*Ch. Juſt.* Is there not as palpable a Fraud, when a Man fells a Negro as a Slave whom he knows to be free, as when he fells a Bag of Feathers and aſſures them to be Hops? That he knew them to be free they muſt prove, or do not ſupport their Declaration. (3)

*Mr. Otis* offered a Depoſition lodged in the Caſe to be read.

*Mr. Thacher* demanded, as the Witneſs was there in Court, she might be examined orally. (4)

*Court ruled,* that when Depoſitions come up in the Caſe they may be firſt read. (5)

*Mr.*

---

(3) According to the rule now ſettled in this country, it ſeems that the *ſcienter* would be unneceſſary — the vendor being liable on the implied warranty of title in the ſale of a chattel. *Coolidge* v. *Brigham*, 1 Met. 547.

(4) Among the papers in this caſe are the depoſitions of Anna Bill and Lydia Whitaker, one of whom was undoubtedly the witneſs " there in Court." The depoſitions are ſubſtantially ſimilar, and the following is an exaĉt copy of that of Lydia Whitaker : —

" Lydia Whitaker of Lawfull age teſtifies & ſays that ſhe was at the
" houſe of Capt. John Sale when Mr Nath'l Brown & Mr John Oliver
" came to buy two of his negro boys & Capt. Sale told them that he
" would not fell them for Slaves becauſe he underſtood they were to be
" free after ſome time, & he would only fell his right & title in them,
" & Mr Oliver ſaid he would run the riſk of their ever getting free.

<div align="center">

her

" LYDIA ✕ WHITAKER

mark

</div>

" Sworn before the Court in Oĉt'r 1761

<div align="right">" Att. MIDDLECOTT COOKE *Cler.*"</div>

(5) The cuſtom of uſing the depoſition in addition to oral teſtimony once prevailed in Maſſachuſetts. Compare Colony Law of 1647 and Prov. St. of 7 W. 3, (Anc. Chart. 209, 288,) with the St. of 1797, c. 35, reënaĉted in Rev. Sts. c. 94, § 25, and Gen. Sts. c. 131, § 28.

*Mr. Otis.* When the Apprentice's Indentures are affigned, he may properly be faid to be fold, but 'tis no Argument of his Slavery.

The Evidence being clear that Sale had faid he would not fell them as Slaves, and told Plaintiff fo when they were fold, *the Court* directed the Jury to find Defendant Cofts.

N. B. In Aggravation of Damages, had they found for the Plaintiff, *Mr. Thacher* faid: "Oliver by felling thefe Boys for Slaves expofed himfelf to a Writ of Replevin,* upon which if Sheriff returns ' *They are Efloigned*,' there fhall go a *Capias in Withernam,*† and his own Body fhall be fubjected to Confinement till they are produced."

* *Homine replegiando.* Vid. F. N. B. 66. New Nat. B. 151, 152.
† If this is returned *non eft invent.*, a *Capias* fhall iffue againft the Defendant's Goods and Effects.